

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 2 9 2005

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NEW BREED LOGISTICS, INC.,

   Plaintiff,

  v.

ALFRED KARCHER, INC.,

   Defendant.

CIVIL ACTION NO.



1 05-CV 1999

E-CC

## COMPLAINT

### INTRODUCTORY STATEMENT

This is an action for breach of a contract entered into between Plaintiff New Breed Logistics, Inc. ("New Breed") and Defendant Alfred Karcher, Inc. ("AKI").

### PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff New Breed is incorporated in North Carolina, with its principal place of business located in Greensboro, North Carolina.  New Breed has operations in Georgia and is registered to do business in Georgia.

2.

Defendant AKI is a Delaware corporation with its principal place of business located at 2170 Satellite Boulevard, Suite 350, Duluth, Georgia 30097.  Defendant AKI may be served through

its registered agent for service of process in Georgia, Corporate Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3.

The sum or value of the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and this Court has original jurisdiction of this action pursuant to 28 U.S.C. §1332, as one arising between citizens of different states where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.

Pursuant to 28 U.S.C. §1391, venue of this action is proper in this judicial district and division because a substantial part of the events giving rise to New Breed's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

5.

New Breed is a provider of supply chain network solutions in facility implementation, physical distribution, information services, and supply chain management.

6.

Defendant AKI is a company that specializes in the development, production, and distribution of cleaning equipment

- 2 -

for private and professional use.

7.

The parties entered into a Warehousing, Fulfillment, and Distribution Services Agreement, dated November 9, 2001 (the "Agreement").  A copy of the Agreement is attached to this Complaint as Exhibit "A".

8.

Paragraph 1.5 of the Agreement defines "events of default" as including a party's "fail[ure] to pay when due any invoice for services rendered or other amount payable hereunder within fifteen (15) days after the due date . . . ."

9.

Pursuant to Paragraph 2.8 of the Agreement, Termination for Cause, if a party is in "material breach of this agreement, which may include . . . those circumstances defined in paragraph 1.5, the non-breaching party may provide a written notice to the breaching party specifying the nature of the breach.  The breaching party shall have thirty (30) days from receipt of such written notice to cure the material breach. . . .  In the case of termination for cause of this agreement by New Breed in the event of a material breach by [AKI], [AKI] agrees to pay liquidated damages to New Breed in the amount of $50,000.00." Section 2.9 of the Agreement states that "[a]ny right of

termination set forth in this agreement is a non-exclusive remedy, and any termination shall be without prejudice to any claims for damages or other rights of New Breed or [AKI]."

10.

In or about the second half of 2004, Defendant AKI failed or refused to pay Plaintiff for services rendered under the Agreement.  At or before Defendant AKI performed a physical inventory of its product at New Breed's facility in November 2004, New Breed discovered that Defendant had already entered or was negotiating to enter into an agreement with CPS, a competitor of New Breed, and that Defendant was seeking to have New Breed ship to CPS the inventory New Breed was storing and distributing on behalf of Defendant.

11.

As a result of Defendant's nonpayment, and in order to terminate the Agreement prematurely without the penalties provided under the Agreement, Defendant and New Breed began negotiating an amendment to the Agreement.  Defendant sought to remove its inventory prematurely in order to avoid certain costs and penalties.  Plaintiff stated that, in order to reduce payments owed to it and allow for a premature exit, Defendant would have to agree to a fixed monthly fee that could not be the subject of any dispute or set off.  In negotiating this issue,

Defendant's President specifically promised New Breed that, even if it removed all of its inventory prematurely, it would continue to pay a fixed monthly fee through the remainder of the Agreement's terms.

12.

Based on these promises and assurances, on November 30, 2004, the parties entered into a letter agreement ("2004 Amendment").  The 2004 Amendment is attached to this Complaint as Exhibit "B".

13.

The 2004 Amendment, drafted by Defendant AKI, contained the following relevant provisions:

\*\*\*

3.   Each month, AKI will pay a final invoice presented to it for services during the preceding month within ten (10) days of its receipt of such final invoice.  In the event that any portion of a final monthly invoice is disputed by AKI, it will pay the portion not in dispute within ten (10) days of its receipt of the applicable invoice, however **AKI and [New Breed] agree that the fixed monthly fees that total $37,207 per month, as set forth in paragraph 4, will not be subject to any dispute or setoff.**

4. . . . . AKI agrees that the minimal monthly amount payable by it to [New Breed] will be $37,207 for each of the remaining months under the agreement (December 2004, January, February and March, 2005), as evidenced and agreed upon as set forth in invoice number 4900033 in the total amount of $148,828, attached hereto and incorporated herein by reference. . . . . AKI will not be responsible for any payments over and above said agreed fixed monthly fees of $37,207 per month, unless

additional services are requested by AKI to be performed by [New Breed].

5.   AKI will pay the November invoice in the same manner as has been described above relative to the months, December 2004, January, February and March, 2005.

14.

Thereafter, AKI requested and New Breed provided additional services under the 2004 Amendment, invoiced and valued at $9,411.60.

15.

New Breed continued to provide services under the Agreement and its amendments, including the 2004 Amendment.

16.

Defendant AKI continued to pay New Breed for services rendered under the Agreement and its amendment, including the 2004 Amendment.

17.

In December 2004 and January 2005, Defendant removed all of its inventory from New Breed's premises. Despite explicit promises to the contrary, immediately upon removing all of its inventory, Defendant ceased making any payments to Plaintiff under the Agreement and 2004 Amendment.

18.

More specifically, Defendant AKI refused to pay the fixed

monthly payment of $37,207.00 per month for February and March 2005 services.   Defendant AKI refused to pay these monthly invoices, not subject to any dispute or setoff, within ten (10) days of its receipt of the applicable invoices.

19.

After repeated oral demands for payment, on June 21, 2005, New Breed provided Defendant AKI with a written "Notice of Default", demanding the February and March 2005 fixed monthly payments, along with the $9,411.60 of additional services provided, for a total amount owed of $83,825.60.

20.

In this Notice of Default, New Breed reminded Defendant AKI that the fixed monthly fees owed to New Breed ($37,207 per month, for a total amount of $74,414), were not subject to any dispute or setoff.

21.

Demand was made for full payment of the amount by June 30, 2005.

22.

To date, Defendant AKI has refused to pay the remainder due and owing New Breed, in violation of the Agreement and the 2004 Amendment.

## COUNT I

### (Breach of Contract)

23.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22 above as if fully set forth herein.

24.

Plaintiff and Defendant entered into a valid and binding Agreement, as well as the 2004 Amendment to that Agreement.

25.

Plaintiff fully performed all of its obligations or conditions, if any, which are or may be a condition precedent to enforcing its rights under the Agreement and 2004 Amendment between it and Defendant.

26.

Defendant materially breached the Agreement and the 2004 Amendment by, among other things, refusing to make full payment to Plaintiff of the monies due and owing to it under the Agreement and 2004 Amendment.

27.

As a direct and proximate result of Defendant's breach of the Agreement and 2004 Amendment, Plaintiff has been damaged in

an amount not less than $75,000, exclusive of interest and costs.

## COUNT II

### (Promissory Estoppel)

28.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 27 above as if fully set forth herein.

29.

In order to induce Plaintiff to enter into the 2004 Amendment and continue to provide services to Defendant, Defendant drafted the 2004 Amendment wherein, among other things, Defendant promised to pay within ten (10) days of its receipt of a final monthly invoice, a fixed monthly fee totaling $37,207, which fee was not "subject to any dispute or setoff."

30.

Defendant also promised that it would continue to make monthly payments if Plaintiff allowed Defendant to remove its inventory. Defendant expected or reasonably should have expected that Plaintiff would rely on its promise.

31.

In entering into the 2004 Amendment, allowing Defendant to remove inventory, and by providing subsequent service of value,

Plaintiff did rely on Defendant's promises to its detriment.

32.

Injustice can be avoided only by enforcement of Defendant's promises.

### COUNT III

### (Unjust Enrichment)

33.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 32 above as if fully set forth herein.

34.

Plaintiff fully performed all of its obligations pursuant to the Agreement and 2004 Amendment.

35.

Defendant has refused to pay Plaintiff the amounts due and owing it under the Agreement.

36.

Because Defendant agreed to pay Plaintiff a fixed monthly sum that was not subject to induction or setoff, Plaintiff reasonably expected that Defendant would pay this fixed monthly sum.  Defendant also requested that Plaintiff provide additional services of value.

37.

Plaintiff reasonably expected it would be paid the agreed-upon value for these services, when such services were provided, and when payment was due. It would be unjust to permit Defendant to retain the monies owed to Plaintiff.

## COUNT IV

### (Fraudulent Inducement and Misrepresentation)

38.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 37 above as if fully set forth herein.

39.

Prior to entering into the 2004 Amendment, the parties discussed when Plaintiff would remove its inventory from Defendant's premises. At that time, Plaintiff expressed concern that, once the inventory was removed, Defendant would cease paying the payments under the Agreement and 2004 Amendment. To induce Plaintiff to enter into the 2004 Amendment, Defendant's President, on behalf of Defendant, made representations to Plaintiff concerning Defendant's payment of the fixed monthly fees, not subject to any dispute or set off, and stated that Defendant would make all payments under the 2004 Amendment, even

if all inventory was removed prior to the end of the term of the Agreement.

### 40.

By the end of January 2005, Plaintiff had removed all of its inventory from Defendant's premises. Thereafter, it refused to pay Defendant under the terms of the Agreement and 2004 Amendment.

### 41.

Upon information and belief, at that time that Defendant made such representations, it did not intend to honor its promise. Upon information and belief, Defendant made this representation knowing it was false in order to induce Plaintiff to enter into the 2004 Amendment.

### 42.

In reliance upon Defendant's promise, Plaintiff entered into the 2004 Amendment and forewent significant payments owed to it.

### 43.

As a proximate result of this fraudulent misrepresentation, Defendant has sustained damages in an amount to be determined at the time of trial.

## COUNT V

### (Punitive Damages)

44.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 43 above as if fully set forth herein.

45.

By reason of the aforesaid, Plaintiff prays for an award of punitive damages against Defendant pursuant to O.C.G.A. § 51-12-5.1 to deter such willful misconduct in the future.

## COUNT V

### (Recovery of Expenses of Litigation- O.C.G.A. §13-6-11)

46.

Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 45 above as if fully set forth herein.

47.

By reason of the aforesaid, Defendant has acted in bad faith, has been stubbornly litigious, or has caused Plaintiff unnecessary trouble and expense, entitling Plaintiff to an award of expenses, including its attorneys' fees.

WHEREFORE, Plaintiff prays:

(1)  that process and summons issue and be served upon the named Defendant as provided by law;

(2)  that it be awarded compensatory damages, together with interest thereon;

(3)  that it be awarded punitive damages;

(4)  that it be awarded attorneys' fees and costs of suit; and

(5)  that Plaintiff have such other and further relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands a jury on all claims and issues so triable.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiff certifies that the foregoing COMPLAINT has been prepared in Courier New font, 12-point type, which is one of the font and point selections approved by the Court in Local Rule 5.1(B).

DATED this 29th day of July, 2005.

Respectfully submitted,

Jeffrey D. Mokotoff
Georgia Bar No. 515472
jmokotoff@fordharrison.com
Renee A. Canody
Georgia Bar No. 243660
rcanody@fordharrison.com

FORD & HARRISON LLP                    Attorneys for Plaintiff
1275 Peachtree Street, N.E.            New Breed Logistics, Inc.
Suite 600
Atlanta, GA  30309
Telephone: (404) 888-3800
Facsimile: (404) 888-3863

Atlanta:374365.1

# EXHIBIT A

FINAL CONTRACT 2001-11-09

# WAREHOUSING, FULFILLMENT, AND DISTRIBUTION SERVICES AGREEMENT

## BY AND BETWEEN

# NEW BREED, INC.

## AND

# ALFRED KARCHER, INC.



**N E W   B R E E D**

S U P P L Y   C H A I N   N E T W O R K S

DATED: 11/09/2001
© 2001 NEW BREED, INC.

# TABLE OF CONTENTS

**1.0 DEFINITIONS** ............................................................................................................... 1

1.1     AGREEMENT ............................................................................................. 1
1.2     CASE ........................................................................................................ 1
1.3     CONTRACT PRICE ...................................................................................... 1
1.4     DISTRIBUTION CENTER(S) ......................................................................... 1
1.5     EVENTS OF DEFAULT ................................................................................. 1
1.6     EXCLUSIVE AGREEMENT ........................................................................... 2
1.7     FACILITY STARTUP .................................................................................... 2
1.8     FORECAST ................................................................................................ 2
1.9     HOLIDAYS ................................................................................................. 2
1.10    HOURS OF OPERATION .............................................................................. 2
1.11    *INSITE* USER .......................................................................................... 2
1.12    LINE ITEM ................................................................................................ 2
1.13    MIXED CASE .............................................................................................. 2
1.14    OPERATING WEEK ..................................................................................... 2
1.15    OPERATION DAY ........................................................................................ 2
1.16    ORDER ..................................................................................................... 2
1.17    ORDER FULFILLMENT CENTER .................................................................... 2
1.18    PALLET ..................................................................................................... 3
1.19    PRODUCT .................................................................................................. 3
1.20    RECEIPT ................................................................................................... 3
1.21    RUSH ORDER ............................................................................................ 3
1.22    SHRINKAGE ............................................................................................... 3
1.23    STATEMENT OF WORK ............................................................................... 3
1.24    WORK ORDER(S) ....................................................................................... 3

**2.0 TERMS AND CONDITIONS** ............................................................................................. 4

2.1     TERM ....................................................................................................... 4
2.2     RENEWAL TERM ........................................................................................ 4
2.3     OPTION TO RENEW .................................................................................... 4
2.4     INVOICES ................................................................................................. 4
2.5     DAYS OF SERVICE ..................................................................................... 4
2.6     PAYMENT OF CONTRACT PRICE ................................................................. 5
2.7     ANNUAL INFLATION ADJUSTMENT ............................................................. 5
2.8     TERMINATION FOR CAUSE ........................................................................ 5
2.9     NON-EXCLUSIVE REMEDY .......................................................................... 5
2.10    TERMINATION FOR CONVENIENCE ............................................................. 5
2.11    LIABILITY AND LIMITATIONS OF DAMAGES ................................................ 5

**3.0 OBLIGATIONS OF NEW BREED** ...................................................................................... 7

3.1     SERVICES ................................................................................................. 7
3.2     STORAGE .................................................................................................. 7
3.3     MAINTENANCE AND SANITATION ............................................................... 7
3.4     RECEIPT AND INVENTORY ......................................................................... 7
3.5     PALLETS ................................................................................................... 7
3.6     RISK OF LOSS: INSURANCE ....................................................................... 7
3.7     ACCESS TO PREMISES ............................................................................... 8
3.8     INDEMNIFICATION OF KÄRCHER ................................................................ 8

3.9     STARTUP SCHEDULE.................................................................................................8

**4.0 OBLIGATIONS OF KÄRCHER .................................................................................. 9**

4.1     DELIVERY OF PRODUCT..............................................................................................9
4.2     STORAGE INSTRUCTIONS............................................................................................9
4.3     ORDERS....................................................................................................................9
4.4     VOLUME FORECAST....................................................................................................9
4.5     INDEMNIFICATION OF NEW BREED ..............................................................................9
4.6     INFORMATION SYSTEMS .............................................................................................9
4.7     INSURANCE................................................................................................................9
4.8     STARTUP SCHEDULE.................................................................................................10
4.9     INFORMATION SYSTEMS – ACCEPTABLE USE POLICY ..................................................10
4.10    MATERIAL CHANGES IN SCOPE OF SERVICES ..............................................................10

**5.0 MISCELLANEOUS ..................................................................................................... 11**

5.1     NO AGENCY ...........................................................................................................11
5.2     CONFIDENTIALITY.....................................................................................................11
5.3     NON-INTERFERENCE WITH BUSINESS/NON SOLICITATION OF EMPLOYEES.....................11
5.4     NOTICES..................................................................................................................12
5.5     NOTICE OF CLAIM....................................................................................................12
5.6     BINDING EFFECT.......................................................................................................12
5.7     HEADINGS AND CAPTIONS.........................................................................................12
5.8     PUBLICITY ...............................................................................................................13
5.9     WAIVER: REMEDIES..................................................................................................13
5.10    COUNTERPARTS .......................................................................................................13
5.11    FORCE MAJEURE......................................................................................................13
5.12    AUTHORITY..............................................................................................................13
5.13    CHOICE OF LAW.......................................................................................................13
5.14    REGULATIONS ..........................................................................................................14
5.15    EXISTING RELATIONSHIPS..........................................................................................14
5.16    SEVERABILITY...........................................................................................................14
5.17    COMPLETE UNDERSTANDING......................................................................................14
5.18    ENTIRE AGREEMENT ................................................................................................14

**EXHIBIT A  CONTRACT PRICE RATES AND CHARGES**

**EXHIBIT B  STATEMENT OF WORK**

**EXHIBIT C  ACCEPTABLE USE POLICY**

**EXHIBIT D  INSITE SUMMARY SPECIFICATION**

**EXHIBIT E  WORK ORDERS**

**EXHIBIT F SERVICE LEVELS**

**EXHIBIT G VOLUME PROJECTION DATA**

# WAREHOUSING, FULFILLMENT, AND DISTRIBUTION SERVICES AGREEMENT

**THIS WAREHOUSING, FULFILLMENT, AND DISTRIBUTION SERVICES AGREEMENT,** hereinafter (the "Agreement") is entered into and is effective as of November 09, 2001, by and between New Breed Logistics, Inc., a North Carolina corporation, located at 4043 Piedmont Parkway, High Point, NC 27265 (hereinafter called "New Breed"), and Alfred Kärcher, Inc, a corporation located at 65 Clyde Road, Suite C, P.O. Box 6910, Somerset, New Jersey, NJ 08875-6910 (hereinafter called "Kärcher").

WHEREAS, New Breed has represented to Kärcher that New Breed has expertise to perform certain service duties and is capable of accomplishing a certain program (as hereinafter defined) for Kärcher; and

WHEREAS, Kärcher is desirous of having New Breed undertake the aforesaid program under the terms and conditions set forth herein,

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises contained herein, the parties hereto agree as follows:

## 1.0   DEFINITIONS

When used herein, the following shall have the meanings specified:

### 1.1   Agreement

"Agreement" shall mean this Agreement, including the Contract Price as defined herein, which includes Rates and Charges as specified in Exhibit A, the Statement of Work ("SOW") specified in Exhibit B, and other attachments herein.

### 1.2   Case

"Case" shall mean each individual carton or box as received, unopened or disturbed.

### 1.3   Contract Price

"Contract Price" consists of the Rates and Charges as set forth in Exhibit A.

### 1.4   Distribution Center(s)

"Distribution Center(s)" shall mean a warehouse(s) to be used by New Breed to service physical distribution requirements in the following locations:  Georgia, New Jersey, Illinois, and California.

### 1.5   Events of Default

"Events of Default" shall mean that, with respect to the parties hereto, either such party shall (a) fail to pay when due any invoice for services rendered or other amount payable hereunder within fifteen (15) days after the due date; (b) fail to pay the Contract Price, as defined herein;  (c) become insolvent; (d) make a general assignment of its assets in whole or in part for the benefit of creditors, or make a general assignment of its assets in whole or in part to an agent authorized to liquidate any substantial amount of its assets; (e) become the subject of an "order for relief" within the meaning of the United States Bankruptcy Code; (f) file a petition in bankruptcy or for reorganization; (g) file an answer to a creditor's petition, admitting the material allegations thereof, for involuntary bankruptcy; (h) apply to a court for the appointment of a receiver or custodian for any of its assets or properties; (i) have a receiver or custodian appointed for  any material portion of its assets or properties, with or without consent, and such receiver shall not be discharged within sixty (60) days after appointment; or (j) adopt a plan of complete liquidation of its assets.

### 1.6   Exclusive Agreement

Exclusive Agreement shall mean that Kärcher, its affiliates and subsidiaries, provides New Breed, its affiliates and subsidiaries, the exclusive right to perform the services outlined in this Agreement and as set forth in the Statement of Work, and that Kärcher shall not directly or indirectly divert the work or services as contemplated under this Agreement to any other outside source except for: (a) services during the Startup Period as defined herein, or (b) upon New Breed's right of first refusal to provide additional services to Kärcher, or (c) upon New Breed's written declination to accept work order(s); or (d) upon the occurrence of an Event of Default, and the inability to cure such default.

### 1.7   Facility Startup

"Facility Startup" shall mean the date a Distribution Center begins shipping orders.

### 1.8   Forecast

"Forecast" shall mean an estimate of volumes for retail distribution by SKU for the next three (3) calendar months. The Forecast shall include estimated demand by SKU and project shipments by month. Any promotional or special distribution or storage requirements shall be identified within the Forecast.

### 1.9   Holidays

Holidays shall mean New Years Day, Martin Luther King Day, President's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day, the day after Thanksgiving, and Christmas Day.

### 1.10   Hours of Operation

Unless otherwise stated, the "Hours of Operation" for the Distribution Center will be 9:00 a.m. to 5:00 p.m., in the local time zone of the Distribution Center, with the exception of the Atlanta, GA, facility supporting spare parts fulfillment, which shall be open 8:00 a.m. to 9:00 p.m. local time.

### 1.11   InSite User

"InSite User" is a named individual with New Breed-authorized access to InSite, New Breed's order and inventory management system.

### 1.12   Line Item

"Line Item" shall mean each individual item listed on a Kärcher Order or Receipt.

### 1.13   Mixed Case

"Mixed Case" shall mean each individual carton or box containing a variety of products.

### 1.14   Operating Week

"Operating Week" shall be defined as a week that begins at 12:01 a.m. on Saturday morning and runs through 12:00 midnight on Friday.

### 1.15   Operation Day

"Operation Day" shall mean any day which is not a Saturday, Sunday or Holiday.

### 1.16   Order

"Order" shall mean the written or "electronic" instructions from Kärcher to New Breed specifying product to be distributed and shipped from the Distribution Center to Kärcher's customers.

### 1.17   Order Fulfillment Center

"Order Fulfillment Center" shall mean New Breed's call center facility at 4043 Piedmont Parkway in High Point, North Carolina.

### 1.18    Pallet

"Pallet" shall mean a Grocery Manufacturers' of America (GMA) equivalent pallet or Standard pallets used by Karcher in manufacturing or pallets used from commercial exchange programs.  Pallets shall have a maximum dimension of 40-inch by 48-inch four-way pallet stacked to a maximum height of 48 inches.

### 1.19    Product

"Product" shall mean Consumer and Commercial Cleaning Equipment and associated spare parts, accessories and detergents.

### 1.20    Receipt

"Receipt" shall mean physical delivery and transfer of goods from Kärcher and its affiliated suppliers to New Breed.

### 1.21    Rush Order

"Rush Order" shall mean an order requiring shipment priority above normal order fulfillment service standards as defined in Exhibit F

### 1.22    Shrinkage

"Shrinkage" is defined as an unexplained negative variance in actual inventory quantity on hand valued at manufacturer's standard cost as reasonably applied under Generally Accepted Accounting Practices (GAAP) or prior accepted practice and reduced by any unexplained positive variance in actual inventory on hand valued  using the same method that results in a loss to Kärcher.  Inventory quantity variances will be calculated as the actual inventory on hand versus the inventory quantities identified in New Breed's warehouse management system.  Shrinkage shall not include any loss the cause of which is covered by the Warehouse Legal Liability Insurance policy.

### 1.23    Statement of Work

"Statement of Work" (SOW) shall have the meaning set forth in Exhibit B.

### 1.24    Work Order(s)

"Work Order(s)" shall have the meaning of a letter or other writing, signed by an authorized individual from each party, adding to or modifying services as specified on Exhibit B and/or providing for corresponding price adjustments. All matters specified in each Work Order shall be governed by this Agreement, subject to any express modifications in such Work Order.

# 2.0   TERMS AND CONDITIONS

Pursuant to this Agreement, Kärcher shall cause product to be delivered to New Breed for storage and distribution, and New Breed shall handle such product as specified herein.  New Breed's responsibilities under this Agreement shall be specified in the attached document referred to as Exhibit B.

## 2.1   Term

This Agreement shall be effective for a period of three (3) years from the Facility Startup of the fourth Distribution Center, unless earlier terminated in accordance with Section 2.8 or 2.10 hereof.  At the end of the three (3) year Agreement, Kärcher, at its sole expense, must remove all residual inventory within a fourteen (14) day period.  Upon expiration, Kärcher will be responsible for all costs associated with storage and handling of its product during the shutdown period.

## 2.2   Renewal Term

A three (3) year period that commences upon expiration of this Agreement if the Option to Renew is properly exercised.

## 2.3   Option to Renew

Either party shall have the option to renew this Agreement by providing written notice of its election to renew this Agreement for the Renewal Term at least ninety (90) days prior to the expiration of the Term of this Agreement. Should neither party contest the Renewal Term; or notify the other of any other cancellation of this Agreement, it will be enforced for the period of one year with all existing conditions.

## 2.4   Invoices

New Breed shall invoice Kärcher as follows:

a)   Startup Fees as defined in Exhibit A will be invoiced to Kärcher as specified in Exhibit A;

b)   Monthly Charges as defined in Exhibit A, consisting of Information Technology Fee, *InSite* User Fees, Renewal Storage Fees, Spare Parts Monthly Fees shall be invoiced on the first day of the month in which the Services were provided; and

c)   Processing and fulfillment charges as defined in Exhibit A such as Order Processing Fee, Initial Storage Fee, Pallet Handling Fee, Fulfillment Fee Per Case, Fulfillment Fee Per Spare Parts, Mixed Case Receiving, and Rush Order Fees shall be invoiced on the last day of the month in which the charges are incurred.

d)   Fees for additional requested services defined in Exhibit A, such as Packaging, Pallets, and Ancillary Labor Fees shall be invoiced in the month that they are procured.

Disputed Amounts.  If Kärcher, in good faith, disputes any charge, it shall give written notice of the specific dispute to New Breed within ninety (90) days after Kärcher's receipt of the invoice provided, however, failure to give notice of a dispute shall not preclude a subsequent adjustment between the parties based upon the results of an audit conducted pursuant to this Agreement.  Both parties agree to use reasonable efforts to resolve any such dispute within thirty (30) days after New Breed receives such notice.  Kärcher shall pay any undisputed amounts according to the aforementioned terms.  Nothing in this Section shall be deemed to limit Kärcher's right to audit and to obtain refunds or credits under this Agreement.

## 2.5   Days of Service

New Breed shall operate the Order Fulfillment Center Monday through Friday from 9:00 a.m. to 6:00 p.m. Eastern Standard Time, excluding Holidays.  New Breed shall operate the Distribution Center(s) Monday through Friday, excluding Holidays during the Hours of Operation.

**2.6      Payment of Contract Price**

New Breed shall invoice Kärcher for the Contract Price and other charges incurred pursuant to Exhibit A, Sections 2.7 and 2.8 of this Agreement.  Kärcher shall pay New Breed the amounts due within thirty (30) days of the date of invoice. After the thirtieth day, an additional fee of 1.5% per month will be added to the outstanding balance.

**2.7      Annual Inflation Adjustment**

All fees identified in this Agreement including those fees set forth in Exhibit A will be adjusted annually on each anniversary date of this Agreement by a percentage equal to the change in the Bureau of Labor Statistics (BLS) index 'Total Private Average Hourly Earnings of Production Workers – Not Seasonally Adjusted' as reported for the preceding calendar year, beginning January 1, 2003, through the term of the Agreement unless otherwise specified.

**2.8      Termination for Cause**

If either party is in material breach of this Agreement, which may include, but not be limited to, those circumstances defined in Paragraph 1.5, the non-breaching party may provide a written notice to the breaching party specifying the nature of the breach. The breaching party shall have thirty (30) days from receipt of such written notice to cure the material breach.   If a material breach specified above is not cured within the specified cure period, the non-breaching party may immediately terminate this Agreement by providing the breaching party with written notice of termination, which written notice shall include the effective date of such termination.   Said effective date of termination shall be no earlier than the first day following the expiration of said cure period.   The rights and obligations of New Breed and Kärcher shall continue in full force and effect during said cure period and up through and including the effective date of termination of this Agreement.   In the case of termination for cause of this Agreement by New Breed in the event of a material breach by Kärcher, Kärcher agrees to pay liquidated damages to New Breed in the amount of $50,000.  In the case of termination for cause of this agreement by Karcher in the event of a material breach by New Breed, New Breed agrees to cooperate and continue to provide services during transition.

**2.9      Non Exclusive Remedy**

Any right of termination set forth in this Agreement is a non-exclusive remedy, and any termination shall be without prejudice to any claims for damages or other rights of New Breed or Kärcher.

**2.10     Termination for Convenience**

Kärcher may terminate this Agreement for reasons other than default by New Breed by providing New Breed with twelve (12) calendar months prior written notice.  In the event of a termination for convenience, Kärcher agrees to pay liquidated damages to New Breed in the amount of $50,000.

**2.11     Liability and Limitations of Damages**

a)   New Breed shall not be liable for any loss or damage to goods stored, however caused, unless such loss or damage resulted from the failure by New Breed to exercise such care in regard to the stored goods as a reasonable careful person would exercise under like or similar circumstances and New Breed is not liable for damages which could not have been avoided by the exercise of such care.

b)   Kärcher agrees to a damage and inventory shrinkage allowance applied annually of 0.20% of the highest monthly value of the Products stored during the year, for which, in the case of loss or damage to Products for any reason or mysterious disappearance, however caused, New Breed shall not be liable.

c)   Kärcher acknowledges that under paragraph 2.10(a), New Breed shall not be responsible for shrinkage or loss in weight, nor for loss or damage to goods resulting from improper packing, insufficient cooperage, breakage, boxing, crating, wear and tear or inherent qualities of the goods.  Nor under such standard, shall New Breed be responsible or liable for loss of product or goods by leakage or through failure to detect same or for concealed damage. All product is stored at owner's risk of loss, damage or delay by acts of God, civil or military authority, enemies of the government, insurrections, riots, strikes, civil commotion, seizure under legal process, labor

disputes, lockouts, or intentional or malicious acts of third persons or any other organized opposition, by water sprinkler leakage, fire, flood, windstorm, cyclone, moths, vermin, insects, corruption, earthquakes, tidal waves, tornadoes or depredation or any cause beyond the control of New Breed.  All storage and handling charges must be paid on goods lost or damaged through no fault of New Breed.

d)    In the case of goods lost or damaged due to causes for which the parties agree that New Breed is responsible, the manufacturer's cost of the goods involved shall be the measure of damages, but in no instance shall New Breed's liability exceed 10 times the base storage rate on a package, cube or per cwt. basis, or 25 cents per pound, whichever is less, unless excess valuation is declared by Kärcher in writing and agreed to by New Breed in writing prior to the time the goods are stored, in which case an additional monthly charge will be made.  In no case shall New Breed be liable to Kärcher or any third party for incidental, consequential, indirect or punitive damages.

# 3.0   OBLIGATIONS OF NEW BREED

Pursuant to the terms and conditions of this Agreement, New Breed shall provide to Kärcher warehousing, fulfillment, and distribution services. New Breed hereby covenants and agrees as follows:

### 3.1   Services

New Breed shall provide warehousing, fulfillment and distribution services as described in Exhibit B.

### 3.2   Storage

New Breed shall properly store Product received on behalf of Kärcher using sufficient care to carry out its obligations thereof. New Breed shall make available pallet positions of storage space at the Distribution Center to accommodate Kärcher's order fulfillment requirements. New Breed may use for its own purpose and, at its sole discretion, any storage space within the Distribution Center not needed to store Product, provided, however, that Kärcher's Product shall not be combined with any other merchandise. New Breed shall store Product indoors with reasonable care. New Breed shall follow stacking instructions provided by Karcher with regards to bulk storage of Product.

### 3.3   Maintenance and Sanitation

New Breed shall provide adequate maintenance and sanitation, as the same relates to space utilized for Kärcher's Product at the Distribution Center(s).

### 3.4   Receipt and Inventory

New Breed shall typically unload and inventory all Products according to the service standards specified in Exhibit F, excluding Saturdays, Sundays and Holidays. New Breed shall have no liability for (a) Product received damaged or (b) any shortage of Product specified on delivery invoices or other documents provided that such damage to or shortage of Product shall be reported in writing to Kärcher within five (5) business days of inventory.

### 3.5   Pallets

Some Product shall be delivered to New Breed on Pallets provided by Kärcher's suppliers, to be exchanged for equivalent Pallets provided by New Breed at Kärcher's expense.

### 3.6   Risk of Loss; Insurance

a)   Product will not be insured by New Breed unless requested by Kärcher in writing and confirmed by New Breed in writing, all at Kärcher's cost except as set forth in 3.6 c. New Breed shall maintain adequate and customary security and safeguarding procedures for the Product.

b)   Kärcher has, and at all times shall retain, title to Product in the possession of New Breed. New Breed shall designate the Product as property of Kärcher and shall take no action inconsistent with Kärcher's ownership of Product, except as expressly contemplated by this Agreement.

c)   New Breed agrees to maintain and cause to be maintained, at its own cost and expense, the following policies of insurance:

    (i)   Basic Warehouse Legal Liability Insurance limited to ten (10) times the monthly storage rate per item.

    (ii)   Comprehensive public liability insurance, including contractual liability coverage, with limits of liability of not less than $1,000,000 for property damage and $1,000,000 for injury to or death of one person, and $2,000,000 for injury to or death of more than one person in any one occurrence; and

    (iii)   Workers' compensation insurance and employer's liability insurance in the amounts as required by law.

**3.7     Access to Premises**

New Breed shall allow Kärcher reasonable access to the Distribution Center.  Kärcher shall provide New Breed at least twenty-four (24) hours prior notice to (a) review the inventory records of New Breed relating to Product and (b) inspect Product and the storage facilities.

**3.8     Indemnification of Kärcher**

Subject to the limitations set forth in paragraph 2.10, New Breed agrees to indemnify and hold Kärcher harmless from any and all claims, liability, loss, damage or other expense, including attorneys' fees, whether for injury to person(s), including death, damage to property or otherwise (i) arising out of any act or omission to act by New Breed, its employees, agents, and/or contractors; or (ii) arising out of New Breed's breach or nonperformance of any provision of this Agreement; except that New Breed shall have no obligations to the extent that any claim, liability, loss, damage or expense is caused by the act or omission to act of Kärcher, its employees, agents, or contractors or subcontractors.

**3.9     Startup Schedule**

New Breed and Kärcher will use best efforts to startup the program on a mutually agreed-on schedule as specified below, but no later than March 4, 2002.

    a.   Phase 1  -  Startup of Retail Channel Distribution on December 15, 2001

    b.   Phase 2  -  Startup of Commercial and Residential Channel Distribution March 04, 2002.

**3.10     Management Review**

New Breed and Karcher shall conduct management reviews on a quarterly basis of the activities under this contract. On a weekly basis New Breed shall provide a management report showing performance against service levels specified in Exhibit P.  Kärcher shall communicate to New Breed any customer complaints regarding service errors and New Breed shall initiate corrective actions for such items.

# 4.0    OBLIGATIONS OF KÄRCHER

Pursuant to the terms and conditions of this Agreement, Kärcher shall deliver to New Breed, for exclusive distribution and order fulfillment services, all Product for the specified requirement of this service.  Kärcher shall also provide information systems support as defined herein.  Kärcher hereby covenants and agrees as follows:

## 4.1    Delivery of Product

Kärcher will notify New Breed electronically, of the description and quantities of all shipments into and out of the Distribution Center(s).

## 4.2    Storage Instructions

Kärcher will notify New Breed in writing as to any deviations in the usual storage, handling, and shipping instructions.

## 4.3    Orders

After the startup period, orders will be received electronically via EDI from Karcher customers by New Breed or directly entered into New Breed's system by Karcher.  An order will be accepted by New Breed if it contains all the necessary information to enable New Breed to process the order without further inquiries including, without limitation, identification of the Products, the name, address and telephone number of the customer to whom the products are to be delivered, ship date, carrier and ancillary required information.  The accuracy of the order shall be the sole responsibility of Kärcher, and New Breed shall not be responsible for errors contained in any orders or for any consequences thereof.

## 4.4    Volume Forecast

Kärcher shall provide to New Breed on a monthly basis within ten (10) days prior to the end of each calendar month, a forecast of volumes for distribution to by each SKU other than spare parts and by distribution center for the next three (3) calendar months ("Forecast").  The Forecast will be used by New Breed in maintaining an adequate staffing level to meet Kärcher customer service requirements.  The Forecast shall include estimated demand by SKU and project shipments by month.  Any promotional or special distribution or storage requirements will be identified within the forecast.

## 4.5    Indemnification of New Breed

Kärcher agrees to indemnify and hold New Breed harmless from any and all claims, liability, loss, damage or other expense, including attorneys' fees, whether for injury to person(s), including death, damage to property or otherwise (i) arising out of any act or omission to act by Kärcher, its employees, agents, and/or contractors; or (ii) arising out of Kärcher's breach or nonperformance of any provision of this Agreement, except that Kärcher shall have no obligations to the extent that any claim, liability, loss, damage or expense is caused by the act or omission to act of New Breed, its employees, agents, or contractors or by some third party.

## 4.6    Information Systems

Kärcher will designate the required resources and pay New Breed's required fees to accomplish the timely interface, per agreed-on specifications and costs, of Kärcher's system and New Breed's order management system, in accordance with mutually agreed upon schedules.

## 4.7    Insurance

Kärcher shall maintain and cause Kärcher's subcontractors to maintain during the term of this Agreement: (1) Workers' Compensation insurance as prescribed by the law of the state or nation in which the work is performed; (2) employer's liability insurance with limits of at least $1,000,000 for each occurrence; (3) automobile liability insurance, if the use of motor vehicles is required, with limits of at least $1,000,000 combined single limit for bodily injury and

property damage per occurrence; (4) Commercial General Liability ("CGL") insurance, ISO 1988 or later occurrence form of insurance, including blanket Contractual Liability and Broad Form Property Damage, with limits of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence; and (5) if the furnishing to New Breed (Warehouseman) (by sale or otherwise) of material or construction services is involved, CGL insurance endorsed to include products liability and completed operations coverage in the amount of $1,000,000 per occurrence. All CGL and automobile liability insurance shall designate New Breed, Inc. and its affiliates as additional insured. All such insurance must be primary and non-contributory and required to respond and pay prior to any other insurance or self-insurance available. Any other coverage available to New Breed (Warehouseman) shall apply on an excess basis. Kärcher agrees that Kärcher, Kärcher Insurer(s) and anyone claiming by, through, under or in Kärcher's behalf shall have no claim, right of action or right of subrogation against New Breed and its customers based on any loss or liability insured against under the foregoing insurance. Kärcher and Kärcher's subcontractors shall furnish prior to the start of work certificates or adequate proof of the foregoing insurance. New Breed shall be notified in writing at least thirty (30) days prior to cancellation of or any change in the policy. Insurance companies providing coverage under this Agreement must be rated by A - M Best with at least an A rating.

**4.8      Startup Schedule**

New Breed and Kärcher will use best efforts to startup the program on a mutually agreed-on schedule, but no later than March 4, 2002.

**4.9      Information Systems – Acceptable Use Policy**

New Breed Corporations Information Systems (IS) Acceptable Use Policy (AUP) for External Users Institutes and documents New Breed-wide computer, Internet, e-mail, data, and applications rules governing the safe operation and acceptable uses of its information systems applicable to clients, business partners, vendors, the general public, and other external users accessing any New Breed system. Kärcher agrees to comply with the terms and conditions of this Acceptable Use Policy attached as Exhibit C.

**4.10     Material Changes in Scope of Services.**

Kärcher may request a material change to the scope of services provided by New Breed to Kärcher, or may add additional Services, by submitting a written request to New Breed. Provided that New Breed agrees to provide such additional Services, New Breed shall provide Kärcher with a Work Order prior to commencing such additional Services for its written approval. The Work Order shall be signed by both parties and attached to this Agreement. The Work Order shall provide for reasonable price adjustments, if applicable, to compensate New Breed for any increases in services involving increased labor or other costs, provided such price adjustments are agreed to by Kärcher.

**4.11     Management Review**

New Breed and Kärcher shall conduct management reviews on a quarterly basis of the activities under this contract. Kärcher shall communicate to New Breed any customer complaints regarding service errors and New Breed shall initiate corrective actions for such items.

# 5.0   MISCELLANEOUS

**5.1     No Agency**

Except as may be expressly provided for herein, nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, or of partnership, or of joint venture, between New Breed and Kärcher, it being agreed that New Breed's relationship to Kärcher is that of an independent contractor.

**5.2     Confidentiality**

a)  Each party agrees to treat as confidential all information that is furnished by the other party in connection with the subject matter of this Agreement, including but not limited to, all proprietary, developmental, technical, marketing, sales, operating, performance, cost, know-how, business and process information; notes, specifications, drawings, analyses, compilations, studies or other documents (collectively the "Confidential Information"), and will not disclose or distribute the Confidential Information of the other party except to such of its employees and agents who have a need to know the Confidential Information, provided that any such employees or agents are advised of the restrictions set forth in this Agreement.   The term "Confidential Information" does not include information which (i) is or becomes published or generally available to the public other than as a result of a disclosure by a party obligated not to disclose under this Agreement; (ii) is or becomes available to a party on a non-confidential basis prior to its disclosure; or (iii) becomes available to a party on a non-confidential basis from a source other than the other party, provided that such source is not bound by a confidentiality agreement with a party which would be violated by such source making such information available to a party and otherwise has the legal right to distribute the information. Confidential Information shall not be deemed to be in the public domain merely because any part of said information is embodied in general disclosures or because individual features, components or combinations thereof are now or become known to the public.

b)  In the event a party becomes compelled by a court of competent jurisdiction, administrative agency or other governmental body to disclose any Confidential Information of the other party, the party being compelled to make the disclosure will provide the other party with prompt notice so that a party may take whatever action it feels is appropriate to protect its rights.

c)  Upon expiration or termination of the Agreement, and upon demand from the other party, all Confidential Information, including copies thereof, shall be returned or the destruction of the Confidential Information certified to the party that provided the Confidential Information. Furthermore, upon demand for the return of Confidential Information, the party returning such Confidential Information shall destroy all memoranda, notes and other writings in its possession which summarize, pertain to, or otherwise describe the Confidential Information.

d)  New Breed and Kärcher agree that they may not have adequate relief at law in the event of any breach by the other of any of the provisions of Section 5.12, and that in such event either party shall be entitled, in addition to all remedies available at law, to injunctive or other equitable relief, without the necessity of posting bond therefore.

e)  The parties agree that the obligations set forth above relating to the disclosure, dissemination, use and return of Confidential Information shall survive the expiration or termination of the Agreement.

**5.3     Non-Interference with Business/Non Solicitation of Employees**

During the Term of this Agreement and any extensions thereof, and for a period of two (2) years immediately following the termination and expiration of this Agreement, New Breed and Kärcher agree not to interfere with the

business of the other in any manner, including, without limitation, soliciting or inducing any employee or independent contractor to terminate or breach an employment, contractual, or other relationship with the other.

### 5.4     Notices

All notices hereunder shall be sent by telephone (confirmed in writing), telex, telecopy, or in writing and shall be deemed to have been duly given if hand-delivered or mailed by registered or certified mail, or by overnight courier, postage prepaid and addressed as follows, unless and until either of such parties notifies the other in accordance with this Section 9.3 of a change of address:

|  |  |
|---|---|
| If to New Breed: | New Breed, Inc. |
|  | Attention:     Louis DeJoy |
|  |                     Chief Executive Officer |
|  | PO Box 18367 |
|  | Greensboro, NC  27410-8367 |
|  |  |
|  | cc: Richard E. F. Valitutto, General Counsel |
|  |     also at above address |
|  |  |
| If to Kärcher: | Alfred Karcher, Inc. |
|  | Attention:     Thomas Van Der Meulen |
|  |                     President and CEO, |
|  |  |
|  | 65 Clyde Rd Suite C |
|  | Somerset, NJ  08875-6910 |
|  |  |
|  | cc: Legal Department, also at above address |

### 5.5     Notice of Claim

a)  Claims by Kärcher must be presented in writing to New Breed within a reasonable time no longer than 90 days after delivery of the goods by New Breed, or 90 days after Kärcher. or the last known holder of a negotiable warehouse receipt is notified by New Breed that loss or injury to the goods has occurred, whichever time is shorter.

b)  No action may be maintained by Kärcher or others against New Breed for loss or injury to the goods stored unless timely written claim has been given as provided in paragraph (a) of this section and unless such action is commenced either within twelve (12) months after date of delivery by New Breed, or within nine months after Kärcher of record or the last known holder of a negotiable warehouse receipt is notified that loss or injury to part or all of the goods has occurred, whichever time is shorter.

c)  When goods have not been delivered, notice may be given of known loss or injury to the goods by mailing a registered or certified letter to Kärcher pursuant to Paragraph 5.4 or to the last known holder of a negotiable warehouse receipt.  Time limitation for presentation of claim in writing and maintaining of action after notice begin on the date of mailing of such notice by New Breed.

### 5.6     Binding Effect

This Agreement shall inure to the benefit of the parties hereto and to their respective successors and permitted assigns.

### 5.7     Headings and Captions

The headings and captions contained in this Agreement are for reference purposes only and shall not affect in any way the meaning and interpretation of this Agreement.

### 5.8    Publicity

Kärcher's Name. During the term of this Agreement and subject to Kärcher's review and written consent, New Breed shall be entitled to (a) advertise and present itself as an authorized provider of Logistic Services to Kärcher and (b) pursue editorial opportunities promoting the services provided to Kärcher, (c) issue press releases, jointly with Kärcher or independently, announcing this contract and the service New Breed provides to Kärcher, and (d) use trademarks, service marks and logos of Kärcher in advertisements and other publicity related publications and activities.

New Breed's Name. Notwithstanding the use of New Breed's name, or listing New Breed as a Service Provider to Kärcher, Kärcher and its employees will not, without the prior written consent in each instance, use in advertising, publicity or otherwise New Breed's name or the name of any of its affiliates, or the name of any of New Breed's officers or employees, nor any logo, trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned by New Breed or its affiliates, nor represent, directly or indirectly, that any product or service provided by Kärcher has been approved or endorsed by New Breed, nor refer to the existence of the Agreement in press releases, advertising or materials distributed to prospective customers.

### 5.9    Waiver: Remedies

No claim or right arising out of the breach of this Agreement can be discharged in whole or in part by waiver or renunciation of a claim or right unless the waiver or renunciation is supported by consideration, and is in writing and is signed by the aggrieved party. Waiver by either party of a breach by the other of any provision of this Agreement shall not be deemed a waiver of any other provision, or of future compliance with all provisions hereunder, and all such provisions shall remain in full force and effect. Failure of either party to enforce any right hereunder shall not be deemed a waiver of any subsequent right hereunder.

### 5.10    Counterparts

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

### 5.11    Force Majeure

Notwithstanding anything in this Agreement to the contrary, neither party shall be liable for damages or any of the other remedies afforded either party because of failure to perform any of the provisions of this Agreement (except for Kärcher's failure to pay) as a result of failure to perform its obligations hereunder or any delay arising out of causes beyond its reasonable control in performance, including, but not limited to, flood, fire, strike, explosion, war, acts of God, acts of any other party, acts of civil or military authority, labor disputes of any kind, power shortage, accident or any cause beyond the control of such party, including, but not limited to, interruption of or delay in transportation, shortage or failure of supply of raw materials or finished merchandise, labor trouble or other business difficulties arising from or in compliance with any order, direction or request from any government office, department or agency, but such events shall not include increased costs of performance. The foregoing is subject to the understanding that nothing contained in this Section 5.11 shall affect the right of either party hereto to terminate this Agreement in accordance with the provisions of Section 1.5, 2.8, or 2.10 hereof. If delivery of acceptance is delayed or interrupted for any such cause, the applicable time to perform shall be extended accordingly on notice to the other party.

### 5.12    Authority

New Breed and Kärcher each hereby represent and warrant that the persons executing this Agreement on their behalf have the full power and authority to do so and thereby bind the corporation.

### 5.13    Choice of Law

This Agreement and all transactions under it shall be governed by the laws of the State of New Jersey excluding its choice of laws, rules and excluding the Convention for the International Sales of Goods. Kärcher agrees to submit to the jurisdiction of any court wherein an action is commenced against New Breed based on a claim for which Kärcher

has agreed to indemnify New Breed under this Agreement. With respect to disputes between the parties, the parties agree to submit to the jurisdiction of the state and federal courts of New Jersey.

### 5.14    Regulations

New Breed and Kärcher shall conform to all applicable Federal, State and local regulations including those regarding occupational safety and health and shall have in effect, throughout the term hereof, any and all licenses, permits and/or approvals required in connection with activities hereunder.

### 5.15    Existing Relationships

New Breed and Kärcher represent that the performance of and receipt of the services required under this Agreement does not violate any agreement(s) or relationship(s) existing or terminated between their respective company and any other individual, entity, organization or corporation.

### 5.16    Severability

If any part of this Agreement, or any purchase order thereunder, is void, voidable, invalid, or unenforceable, for any reason, the Agreement or purchase order shall then be considered divisible as to such part with the remainder of the Agreement or purchase order remaining as valid and binding as though such part were not included in the Agreement.

### 5.17    Complete Understanding

This Agreement sets forth the entire Agreement between the parties. This Agreement may not be changed, altered, or amended except in writing and signed by both parties.

### 5.18    Entire Agreement

The provisions of this Agreement supersede all contemporaneous oral agreements and all prior oral and written communications and understandings of the parties with respect to the subject matter of this Agreement. No addendum, supplement, modification, or waiver of this Agreement shall be binding unless it is in writing and signed by both parties. No waiver of any of the provisions of the Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a waiver of any subsequent condition or event unless otherwise expressly provided.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement in a manner appropriate to each as of the date first written above.

NEW BREED, INC.                                         ALFRED KARCHER, INC.

BY: _____                           BY: _____   11/23/01

Title: _____                           Title: _____CEO_____

Attest: _____                           Attest: _____

Title: _____                           Title: _____

FINAL CONTRACT 2001-11-09

# EXHIBIT A
# CONTRACT PRICE
# RATES AND CHARGES

# EXHIBIT A – Contract Price

**1.1      Start-up Fee**

**Pre-Opening Expenses** – A Pre-Opening Expense of **$218,087** will be invoiced to Kärcher before beginning order fulfillment services. This one-time fee includes the eight (8) work orders itemized in Exhibit E. In addition, this fee includes two (2) weeks of employee training before startup. This fee will be invoiced upon execution of this contract with $72,696 due 30 days from execution of the contract, $72,696 due 30 days from December 15, 2001 and the balance of $72,695 due 30 days from Phase 2 transition scheduled for March 4, 2002.

**1.2      Information Technology Fees**

An Information Technology Fee of **$1,591** will be invoiced on a monthly basis for each distribution center and includes the amortization of the investment to provide the necessary hardware and software to operate each distribution center.

An *InSite* User Fee of **$200** per month will be invoiced for 25 Kärcher *InSite* users. This fee includes the costs to provide on-going support and licensing fees for the software application and maintenance agreements for the hardware, as well as telecommunications fees between the DC and the Data Center.

**1.3      Order Processing Fee**

An Order Processing Fee of **$0.65** will be assessed to each order received electronically or entered directly into New Breed's system by Karcher. In addition, during the transition starting at receipt of Karcher product at the first New Breed facility and ending at Phase 2 transition, New Breed will charge a flat monthly fee of $2,500 and provide a full time order analyst to support Karcher order activity. After the transition, New Breed will no longer charge this flat monthly fee but instead will charge a Special Service fee of $5.00 for each order that require change, checking, correction or cancellation after it has been allocated.

**1.4      Initial Storage Fees**

The Initial Storage Fee (1st – 15th) will be assessed for each pallet received between the first (1st) and fifteenth (15th) day of each calendar month. The fees are site-specific due to varying facility costs and are listed below. Pallets received after the 15th will be assessed 50% of the Initial Storage Fee, as listed in Table A-1. These fees include the DC overhead costs associated with storing each pallet.

**1.5      Renewal Storage Fee**

The Renewal Storage Fee will be assessed for each pallet on-hand at the beginning of each calendar month. This fee includes the DC overhead costs associated with storing each pallet.

**1.6      Pallet Handling Fee**

A Pallet Handling Fee will be invoiced for each pallet shipped. This fee includes the labor required to offload the pallets from the trailer, an OS&D inspection of the goods, processing the receipt transaction to receive the product in inventory, staging the pallet for shipment, applying the necessary shipping labels, and loading the pallets onto the outbound trailer.

**1.7      Fulfillment Fee Per Case**

The Fulfillment Fee Per Case will be assessed for each full case picked per order. This fee includes the labor required to prepare the order for picking, picking the order, consolidation of the order at the dock, stretch wrapping the pallet as needed, applying labels and placards as required, preparing all related shipping documentation, and loading the pallets on the outbound carrier vehicle.

### 1.8   Spare Parts Fulfillment Fees

A Spare Parts Monthly Fee of **$1.423 per square feet** for the spare parts receiving, storage, picking, processing and staging area of approximately 5,918 square feet, will be invoiced for the Atlanta, GA, distribution center. This fee includes the following allocated costs: spare parts receiving, storage, picking, processing and staging space for the storage of 5,600 SKUs of spare parts; insurance costs; security systems; facility maintenance; clerical and administrative personnel; supplies; and other related overhead costs.  The actual area that this fee applies to will be determined when facility layouts are completed for the Atlanta Distribution Center.

A **Fulfillment Fee Per Spare Parts** line item of **$0.71** will be assessed for each line item picked per spare parts order for fulfillment.  This fee includes the labor required to prepare the order for picking, pulling the product to the small parcel picking area, picking the order, over packing the cases as required for small packaging shipping, applying labels and placards as required, preparing all related shipping documentation, and loading the shipment on the outbound carrier vehicle.

### 1.9   Storage And Handling Fee Summary

The table below is a summary of the storage and handling fees for distribution of the Kärcher product lines across the distribution network.

**Table A-1  Storage and Handling Fees**

| Storage and Handling Fees | Distribution Centers | | | |
|---|---|---|---|---|
| | New Jersey | California | Georgia | Illinois |
| Initial Storage Fee (1st -15th) | $4.88 | $4.53 | $4.77 | $4.65 |
| Initial Storage Fee (after 15th) | $2.44 | $2.27 | $2.38 | $2.33 |
| Renewal Storage Fee | $4.88 | $4.53 | $4.77 | $4.65 |
| Pallet Handling Fee | $4.81 | $4.08 | $4.08 | $4.27 |
| Fulfillment Fee per case | $0.37 | $0.40 | $0.40 | $0.42 |

Specialized handling of hazardous materials, specifically any detergents requiring MSDS sheets, is not included in the above pricing.  General Warehousing and Liability Insurance as described in Section ___ does not include the storage of hazardous materials.

### 1.10   Fees for Additional Requested Services

Kärcher has requested additional services to include receiving cases containing more than one SKU and to ship orders that arrive between 3:00 p.m. and 6:00 p.m. on the same day as rush orders.  These items apply as additional rates.  The fees for these additional requested services will be as follows:

1) **Mixed-Case Receiving Fee** — multiple SKUs received in a case will be charged by line item at **$0.16** per item.

2) **Rush order fee** — Dealer Orders received between 3:00 p.m. and 6:00 p.m. during business days that must be shipped the same day as rush orders will be billed a rush order fee of **$7.50** per order. Rush orders will be filled on a best-effort basis.  For retail orders, expedited requirements will be scheduled on a case-by-case basis and charged using the labor rates for additional services specified under 1.11.

3) **Packaging** - Packaging and shipping supplies are not included in the above pricing can either be provided directly by Kärcher or provided by New Breed to Kärcher specifications at cost plus seven (7) percent.

4) **Pallets** are not included in the above pricing and will be provided as required at a cost of. **$7.50** per pallet.

5) If Kärcher's request a **Physical Inventory** is requested New Breed will provide the service at the below prescribed labor rates

### 1.11    Labor Rates for Additional Services

The following items are not included in the prices listed in the proposal and are for work outside the scope of work outlined within that proposal.  These include the ancillary labor rates as presented in the table below.

| Position Description | Hourly Rate |
|---|---|
| Supervisor | $ 32.65 |
| Forklift Operator | $ 22.22 |
| Material Handler | $ 16.17 |
| Clerk | $ 21.43 |
| **California** | |
| Supervisor | $ 32.65 |
| Forklift Operator | $ 21.43 |
| Material Handler | $ 16.17 |
| Clerk | $ 20.62 |
| **Florida** | |
| Supervisor | $ 32.65 |
| Forklift Operator | $ 21.43 |
| Material Handler | $ 16.17 |
| Clerk | $ 20.62 |
| **Illinois** | |
| Supervisor | $ 32.65 |
| Forklift Operator | $ 23.72 |
| Material Handler | $ 16.17 |
| Clerk | $ 22.54 |

Overtime pay will be calculated at the rate of 1.5 times the normal hourly rate of pay.

Holiday pay will be calculated at the rate of 2 times the normal hourly rate of pay.

The fees for services requested by Kärcher, but not identified within Exhibit A, will be invoiced to Kärcher at the following hourly rates:

Information Technology Professionals          $145.00 per hour
Logistics Management Professionals          $100.00 per hour

### 1.12    Returns Processing Fees

A return-processing fee of $1.60 will be assessed for each Return Authorization processed. This fee includes the labor to open cartons, sort and identify returns, and prepare for receiving into the WMS system.

A return-processing fee of $2.46 will be assessed for each returned item that is inspected.   If items are returned that do not require inspection, labeling or separate putaway no fees will be charged for such item. This fee includes the labor required to collect returns crediting information, apply labels as required, and the putaway of each item.

### 1.13    Basis of Prices

Prices are based on the following parameters:

- Volume Projection Data for 2002 included in Appendix G.  Beyond 2002 Karcher expects annual growth of 15% - 20%.

- Machines, accessories, and detergents will be picked from racked or bulk storage locations.  Spare parts will be picked from shelved storage.

- Pallets stored in racks based on 40" x 48" x 48" dimensions.

- Pallets stored in a narrow-aisle configuration to maximize warehouse storage space.

- Consumer machines, accessories and detergents will be distributed from the California, Illinois, New Jersey and Georgia distribution centers.  Commercial Machines will be distributed out of the Georgia Distribution Center.

- 100% of the spare parts volume will be distributed out of the Atlanta, GA, facility.

- Pricing to Kärcher does not contain any financial reserves to address Compliance Fees.

FINAL CONTRACT 2001-11-09

# EXHIBIT B
# STATEMENT OF WORK

FINAL CONTRACT 2001-11-09

# EXHIBIT B

# 1.0   FACILITY AND EQUIPMENT

## 1.1     Facility and Equipment

This section describes the facility, equipment, and security that shall be provided by the Company for the performance of the Kärcher Warehousing and Distribution Center Operations.

## 1.2     Facility Description

The facility shall be organized into functional areas, including:  receiving, warehousing, processing, shipping, and administration.

To ensure the safety of employees and product, each area shall have lighting, heating, ventilation, electrical power, and equipment and staffing associated with the processes performed in each location.

The exterior site shall include both car and truck traffic and parking areas.   Car and truck traffic shall be segregated to the greatest possible extent to ensure maximum employee safety.

Adequate exterior lighting shall be provided.

## 1.3     Receiving Area

The Distribution Center functional areas adjacent to the docks include inbound staging areas for the timely unloading and inspection of inbound inventory, and shall include a sufficient number of desks for the processing of paperwork, storage of labels, and driver transactions.

A portion of the Shipping Office shall also be allocated to this functional area to allow for the involvement of the logistics clerks in the receiving process.

## 1.4     Warehousing Area

The Warehouse Department shall include the bulk storage racks and the forklift aisles.

Rack positions shall be identified with both alphanumeric and bar-coded labeling to facilitate the use of the RF scanning equipment integrated with the WMS.

## 1.5     Processing Area

The Processing Department includes Packing Tables, Manifesting Stations and a Palletization Area.

## 1.6     Shipping Area

The outbound staging area includes the floor space necessary to accumulate the manifested orders awaiting shipment.  A portion of the shipping office is also allocated to this functional area to allow for the involvement of the logistics clerks in the outbound processes.

## 1.7     Security

Facility design security features include the control of access to the facility by a single entrance and exit for all employees and a single controlled entrance for drivers.  The system shall include sensors on all exterior doors, interior motion sensors, and zoning to allow partitioning.

Emergency exits shall have panic bar alarms that sound if the door is opened and can only be turned off by plant management.

# 2.0   DISTRIBUTION CENTER PROCESSES

## 2.1   Distribution Center Processes

This section describes the Distribution Center processes that shall be conducted by the Company for the performance of the Kärcher Warehousing and Distribution Center Operations.

## 2.2   Receiving

Company shall receive shipments directly from Kärcher manufacturing sites as well as from Kärcher suppliers.

Company shall schedule appointments for inbound Kärcher shipments.

All receipt records shall be maintained via Company's WMS, with documentation provided to Kärcher on request. The following outlines the Receiving Process that Company shall employ to handle Kärcher shipments:

1) All inbound carrier drivers shall sign in and out at the Company Receiving Office and are provided with instructions as to which dock door to park the trailer for unloading.

2) The Material Handler then visually inspects the inbound carrier truck seal and cargo, looking for physical damage or trailer tampering.

  a) If no damage is discovered, the Material Handler shall unload the shipment, palletize floor-loaded cases if required, and place palletized product into a designated Receiving Staging Area.

  b) If damage is discovered, the material handler shall implement the Overage, Shortage, and Damaged (OS&D) process.

3) If product is received with multiple SKUs per pallet, the product shall be re-palletized with one (1) SKU per pallet.

4) Additional labeling will be charged at hourly rates and cost of materials.

5) All damage and discrepancies shall be noted on the Bill of Lading

6) Company verifies receipt of all incoming goods in terms of quantity using the Packing List.

7) Bar code-scanning equipment will be used to receive all inbound inventory as well as capture serial numbers if required, provided appropriate bar coding is available on the product.

## 2.3   Putaway (Inventory Storage)

Company's WMS uses RF-assisted putaway of inbound materials.  The racked storage area for each site will include five-high storage racks with wire decking along with narrow-aisle forklift access. All rack positions will be labeled with both human-readable and bar coded labels. For the pick pack operation, boxed shelving will be utilized to provide the pick faces for small parts.

During the RF assisted put away process, Material Handlers shall perform the following tasks:

- obtain the next pallet of inventory requiring putaway;

- scan the pallet label and obtain a putaway location from the WMS;

- transport the pallet of inventory to the system recommended put away location; and

- place the pallet into the location and scan the location bar code to complete the transaction.

The Material Handler assigned to inventory putaway shall continue to perform these tasks until all of the Kärcher inbound inventory awaiting storage has been properly located within the Distribution Center.

## 2.4      Distribution Center Order Processing

The Distribution Center shall receive orders from Company's Central Logistics Management group once all information has been verified and sufficient inventory to fulfill the order has been determined. After a group of orders has been properly transferred to the WMS, an Order Processing Clerk shall sort the orders into "Pick Waves" to optimize the productivity of the picking and shipping processes.

## 2.5      Order Fulfillment

The Company shall fulfill Kärcher orders as follows:

**Full Pallet Pick:**

The Order Picker obtains the collated documentation from the Order Preparation Clerk and takes it to the full pallet pick area.

The Company's WMS will facilitate the order fulfillment process by generating pick labels that include storage locations for each item ordered.  The system lists the items to be picked in an order that minimizes the travel distance within the facility.

Full pallet picks will be retrieved using a forklift and moved to the manifesting staging area. Subsequent pallet picks, case picks and or piece picks for the order will be combined and transported to the Quality Assurance/Packaging Area to be inspected for order accuracy, and stretch wrapped.

**Full Case Pick:**

The Order Picker obtains the collated documentation from the Order Preparation Clerk and takes it to the full case pick area.

The Company's WMS will facilitate the order fulfillment process by generating pick labels that include storage locations for each item ordered.  The system lists the items to be picked in an order that minimizes the travel distance within the facility.

Cases for each order will be picked and placed onto pallets on a pallet jack. The order picker will apply carton labels to the outer wall of the each case. Once the order has been fully picked, the pallet will then be transported to the Quality Assurance/Packaging Area to be inspected for order accuracy.

**Pick & Pack:**

The Order Picker obtains the collated documentation from the Order Preparation Clerk and takes it to the Order Fulfillment Cart Preparation area.  The Order Picker obtains the next available multi-level cart and performs the following cart preparation process:

- Form appropriate size cases and place onto cart,

- Apply pick labels to the inside flap of each case,

- Apply shipping labels to the outer wall of the each case,

- Insert the packing list in the first case of each order.

Company's WMS will facilitate the order fulfillment process by generating pick labels that include storage locations for each item ordered.  The system lists the items to be picked in an order that minimizes the travel distance within the facility.

Order pickers may pick multiple orders simultaneously to maximize picking productivity. Items for each order will be picked and placed into shipping cartons staged on an order fulfillment cart. Once the order has been fully picked, the cart(s) will then be transported to the Quality Assurance/Packaging Area to be inspected for order accuracy, filled with dunnage, and sealed. Orders on the cart will be consolidated with any case pick or pallet pick items on the order.

## 2.6    Manifesting and Shipping

Following the quality check phase of the fulfillment process, each case shall be void filled with protective dunnage and sealed.

Once the cases are sealed, each order shall be manifested.

- The manifesting is based on the outbound mode of transportation required.
- Orders shipped via small parcel carrier shall be manifested one case at a time.
- A shipping label is applied for each case in the order.
- The small parcel manifest is printed.
- The label is applied to the case and assigns the case to the appropriate outbound carrier-staging queue.
- Orders are then consolidated and palletized by distribution center.
- Shipping labels and documentation for each order is generated and placed with the shipment.
- A Material Handler transports the pallets of inventory to the designated shipment staging area.

## 2.7    Inventory Transfers

Moving pallets within the warehouse, otherwise referred to as "re-warehousing", is often done to consolidate partial pallets or improve the organization within the warehouse. Company shall manage the transfer of Kärcher's inventory, as needed, in a process similar to the inbound inventory putaway process. Inventory transfers shall also use the assistance of a RF unit to maintain inventory accuracy. During the process, Material Handlers shall utilize RF units to scan both the item bar code and the original location bar code of the item being transferred. Following the physical transfer of the inventory, the Material Handler shall scan the bar code of the new location to complete the transaction. Tracking of the inventory being transferred shall be provided, while reducing the possibility of error within the process.

## 2.8    Returns Processing

- Returns Processing operation for Kärcher shall be conducted at each New Breed distribution center.
- Karcher will issue and communicate a Return Authorization number (RA #) assigned to a specific return shipment prior to arrival at the distribution center for those returns that are known.
- Karcher will work with New Breed to establish mutually agreed upon shipping methods for returns to facilitate returns processing.
- Receipts shall be recorded, inspected, and confirmed against the Return Authorization number.
- Kärcher returns include product returned from residential customers, commercial dealers, and retailers.
- Product that is returned will be identified and segregated from the available to promise product.
- Kärcher items returned but not authorized will be staged until disposition is given by Kärcher. They will not be entered into inventory until final disposition or authorization from Kärcher is resolved.
- Items returned to the distribution center will include:

  – Commercial machines

- Commercial Accessories
- Commercial parts
- Retail machines
- Retail parts
- Retail Accessories
- Customer machines
- Customer parts
- Customer Accessories

- Reasons for returned items to the distribution center will include, but not be limited to:

  - Mis-shipped orders from the distribution center,
  - Duplicate orders,
  - Recalled goods being returned from commercial dealers and retailers,
  - Overstock Customer refusals,
  - Freight damages due to shipping.

- The Company CSR shall:

- Advise the distribution center of every pending return,
- Work with Kärcher to determine disposition of each return,
- Advise Kärcher of each completed return,
- Report on all return activity.

- Kärcher shall:

  - Approve all returns via manual or electronic Return Authorization forms,
  - Support the Company in resolving returns that arrive at the distribution center without RA numbers,
  - Determine resolution of disposition of returned product on a timely basis.

- Merchandise shall be inspected and qualified for return-to-stock as required by Kärcher.

- All required returns information for crediting purposes will be captured upon identification and receipt and forwarded to Kärcher.

# 3.0   CENTRAL LOGISTICS MANAGEMENT

### 3.1       Overview

This section describes the central logistics services included as part of the Agreement.

### 3.2       Services

New Breed shall:

1) Provide account management to Kärcher and Kärcher's customers to include:

   - Customer Service

   - Order Planning

   - Inventory Planning

   - Supporting the management and oversight of the Company's Distribution Centers

     Maintain the integrity of the item master and customer master within both the InSite OMS and EXceed WMS.

   - Provide operation reports and service metrics as identified within the contract

2) A Customer Service Representative (CSR) will be provided

   - An alternative CSR will be provided to further ensure responsiveness

   - E-mail address and direct line phone numbers will be provided for communication during normal business hours

3) An Inventory Analyst will be provided to perform tasks related to inventory control including cycle counting and data management reporting

4) The Company shall provide an experienced Account Manager to oversee all operational activities, including:

   - Participation in strategic program development and enhancement

   - Implementation and daily operations management

   - Performance report analysis and strategies from problem resolution and prevention

   - Identify opportunities for continuous process and supply chain improvement

   - Ensure adherence to Kärcher program requirements, and New Breed's Quality Management System,

   - Provide timely standard billing and ad hoc reporting

5) The Account Manager shall be available by cell phone to assist Kärcher in resolving any operational issues.

6) The Customer Service Representative (CSR) shall serve as the primary contact for Kärcher and its customers.  The CSR's responsibilities shall include:

   - Ensure the timely receipt and processing of order transmissions

- Order exception management and resolution (e.g., transmission exceptions, un-shippable orders, work in process orders, milestone tracking).

- Execution of order service policies and rules defined, quantified, and documented, such as special requirements, order changes and cancellations, held inventory

- Allocate and dispatch orders to the appropriate distribution center WMS

- Proactive order tracking and performance monitoring

- Support warehouse and client informational requests, order coordination, and service requirements

- Ensure that demand is captured and available for subsequent use if/when defined

7)  The Inventory Analyst is responsible for coordinating and maintaining inventory accuracy, control and administration, and ensuring inventory performance in support of customer and service objectives.  Coordination responsibilities include the following:

- Administering the cycle count and physical inventory programs, and reporting adjustments

- Ensuring inventory accuracy

- Maintaining inventory program documentation and ensuring compliance with program inventory and reporting requirements

- ASN receipt and coordination

- OS&D administration, rejections, exceptions, and disposition coordination

- Item master table administration

- Support order allocation, shipping, DC, and client on all inventory issues

8)  Orders shall be received directly from Kärcher, and the allocation of inventory shall be performed by the Company in accordance with rules directed by Kärcher

- Electronic orders shall be processed into InSite, the Company Order and Inventory Management System

- A validity check for all orders shall be performed to ensure accuracy and completeness.

- Any order(s) not having the minimum information necessary to complete processing shall be errored out of the system for resolution.  For orders that are errored out of the system, the Company's CSR shall contact Kärcher to resolve any discrepancies

- Orders that pass the validity test then shall be analyzed by the Company to ensure sufficient inventory exists, to develop a picking strategy, and to arrange transportation logistics.  Orders without sufficient inventory will result in backorders.

9)  New Breed shall coordinate inventory adjustments with Karcher and ensure that accurate inventories and maintained.

- The inventory analyst will establish and issue counts for a cycle count program that will count A items every month, B items each quarter and C items every two quarters.

- Each New Breed distribution center will conduct the cycle count program based on counts issued by the inventory analyst to maintain the accuracy of the inventory balances within the facility.  Based on cycle counts, when differences in the perpetual book inventory carried in New Breed warehouse management system and actual floor inventory occurs, adjustments may be necessary.

- New Breed will perform inventory adjustments in its systems utilizing the reason codes listed below to advise Karcher of reasons for these adjustments

  a. CUSTREQ – customer requests an adjustment
  b. CYCADJ – cycle count adjustment
  c. DAMAGED – damaged goods
  d. O/S&D – over/short and damaged
  e. PRDISS – production issue
  f. PRDRCPT – production receipt
  g. RCVERR – receiving error
  h. RETDISP – return disposal

- The adjustments will be available to Karcher immediately through the web interface.  Karcher will conduct daily reconciliation activities to post these adjustments into its systems and maintain accurate inventories in its systems.

- The New Breed CSR shall:

  - Coordinate all adjustments with each distribution center.

  - Help with determining root cause of discrepancy to avoid need for future adjustments.

  - Determine the affect an adjustment will have on existing order demand.

  - Monitor New Breed systems for accurate transaction processing and error correction.

  - Advise Karcher of all adjustments, that are material in nature, prior to the adjustment being applied in New Breed systems.

Karcher shall:

1) Karcher shall support the Central Logistics group by providing timely responses to:

   - the Company's CSR's inquiries on behalf of Karcher customers

   - assist in the resolution of discrepancies associated with product orders, as required

   - assist in the resolution of inventory discrepancies, receiving and returns issues

   - provide timely information regarding 'new' store openings and other anticipated volume spikes

   - provide updated item and customer file information so customer orders can be processed and inventory can be received without delay

2) Provide a single point of contact for the above issues as well as other operational issues

3) Support systems integration between New Breed and Karcher company systems.

4) Provide timely change order/cancellation notification

5) Support the inventory reconciliation and adjustment activities through the following:

   - Conduct regular and timely inventory posting and reconciliation activities to maintain current and accurate inventories in Karcher systems.

   - Respond to New Breed CSR requests for material inventory adjustments in a timely manner.

   - Advise the New Breed CSR of customer requests regarding errors in product identification or quantities received to initiate corrective actions to maintain inventory accuracy.

   - Communicate all adjustment related questions or requests to the New Breed CSR.

# 4.0  INFORMATION TECHNOLOGY

### 4.1  Overview

This section describes the information technology services included as part of the Agreement.

### 4.2  Services

New Breed shall:

1) Host a web application, currently named *InSite*, at a New Breed managed data center.

2) Provide all hardware, software, and systems management services required to host the application.

3) Host the web application on the Internet at the following Uniform Resource Locator (URL): http://karcher.newbreed.com.

4) Provide *InSite* functionality as described in the Summary Specification in Exhibit D and provide the *Distribution Centers* with a warehouse management system, currently called *DCWeb* that includes the following functionality:

*DCWeb* functionality is the combination of EXE Technologies EXceed 4000™ product, TanData™ ChainLink™, and Loftware LPS 2000™ software. Functionality is per manufacturer's specifications and supports Kärcher-specific requirements of:

- Recording receipts of Kärcher's inventory

- Picking orders and packing cases

- Managing inventory on a location controlled basis.

- Producing required packing lists, carton labels, and shipping documentation in accordance with Kärcher customer requirements

- Manifesting for United Parcel Service (UPS) and Federal Express (FedEx) shipments.

New Breed will enhance the base services provided by *InSite* and *DCWeb* by the specific work orders included in Exhibit E. Compensation for specific work orders are listed on each work order.

5) Maintain the InSite and DCWeb applications, where the scope of the applications is described above.

6) Provide the Distribution Centers with the hardware, software, and telecommunications required to support Kärcher's customer orders.

7) Provide ongoing support to the Distribution Centers' hardware, software, and telecommunications.

8) Retain online in the InSite database and DCWeb database three (3) calendar months of data in addition to the current calendar month.

9) Provide an information technology (IT) Account Manager who will be the single point of contact for IT services management.

10) Provide Kärcher with up to 25 named user accounts for InSite.

11) Provide each *InSite* for Kärcher user with a user id and password.

12) Provide Kärcher with access to InSite 7 days a week / 24 hours a day with the following exceptions:

  - During the nightly maintenance window, defined as daily from 02:00 a.m. until 6:00 a.m. EST, InSite may not be available due to regularly scheduled maintenance. Additionally, weekly maintenance will be scheduled between 02:00 a.m. until 11:59 a.m. on Sundays.

  - On a quarterly and annual basis a maintenance window in excess of the nightly or weekly maintenance window will be required. The date, time, and duration of the maintenance window will be mutually agreed to by an Kärcher designated representative and New Breed.

13) Based on measurements within New Breed's data center, application availability will be maintained at 98% or higher outside of the maintenance windows.

14) Access to New Breed Help Desk that is available 7 days a week / 24 hours a day for the reporting and tracking of information technology-related problems associated with Agreement. The New Breed Help Desk will:

  - Be available via toll free number or e-mail.

  - Log and track all incidents reported to them by Kärcher personnel.

  - Resolve incidents within their realm of control and refer the incidents to other New Breed personnel or suppliers.

  - Perform problem analysis and determine problem severity.

  - Perform management escalation.

15) Where applicable, New Breed will provide InSite users with two (2) days advance notice of maintenance activities that affect end-user availability or functionality of the application.

16) New Breed will be responsible for the cost, maintenance, and management of the connection from New Breed to the Internet.

17) New Breed will provide the following security mechanisms to minimize business disruption, as follows:

  - Perform proactive monitoring to detect problems before they occur.

  - Automate monitoring to alert key New Breed IT personnel when problems occur.

  - Manually intervene to address exceptions that occur.

  - Use the Acceptable Use Policy, as described in Exhibit C.

  - Provide a user id and password to each *InSite* and *DCWeb* user.

  - Define user profiles for *InSite* and *DCWeb* to present to users only those options they have access to.

  - Use internal database auditing for key tables in *InSite* and *DCWeb*.

  - Log system errors and access messages in a centralized security log server and perform reviews of these logs to determine remedial activities.